## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------x
In re                                        :    Chapter 15
                                             :
Altos Hornos de México, S.A.B. de C.V.¹,     :    Case No. 16-11890 (    )
                                             :
         Debtor in a Foreign Proceeding.     :
--------------------------------------------------------x
```

## DECLARATION OF JAIME GARCÍA PRIANI IN SUPPORT OF
## VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING;
## (II) ENFORCEMENT OF LIFTING ORDER; AND (III) CERTAIN RELATED RELIEF

I, Jaime García Priani, declare as follows:

1.      I am an attorney licensed and in good standing to practice in Mexico.  I am a partner and the senior member of the law firm of Bufete García Jimeno ("BGF") located in Mexico City, Mexico.  I have been retained by Francisco Javier Gaxiola Fernández, the Trustee (defined herein) and the duly appointed, proposed foreign representative (the "Foreign Representative") for the above-captioned debtor (the "Debtor" or "AHMSA"), which is in a proceeding (the "SP Proceeding") under Mexico's Bankruptcy and Suspension of Payments law (the "SP Law"),[2] pending before the First Civil Court of First Instance for the Judicial District of Monclova, Coahuila, Mexico (the "Mexican Court").  I submit this declaration to provide an overview of and explain certain aspects of the SP Law in connection with the *Verified Petition for (I) Recognition of Foreign Main Proceeding;(II) Enforcement of Lifting Order; and (III) Certain Related Relief* (the "Verified Petition")[3] submitted by the Foreign Representative concurrently herewith.[4]

---

[1]      The last four digits of the Debtor's U.S. and Mexican taxpayer identification numbers are 0706 and 6U10, respectively.  The Debtor's executive headquarters are located at Prolongación Juarez s/n, Col. La Loma, Monclova, Coahuila, Mexico, 25770.

[2]      An English translation of the SP Law is attached hereto as Exhibit A.

[3]      Capitalized terms used herein, but not otherwise defined, have the meanings given to them in the Verified Petition.

2.      Although Spanish is my native language, I am fluent in written English and have chosen to submit this SP Law Declaration in the English language.

3.      In preparing this SP Law Declaration, I communicated with the Debtor, the Foreign Representative, and certain professionals retained by the Debtor and the Foreign Representative, and reviewed, among other things, (a) the applicable provisions of the SP Law and the Ley de Concursos Mercantiles (the "Concursos"), which replaced and superseded the SP Law as Mexico's insolvency law in 2000;[5] (b) the original court files and related documents of the SP Proceeding, including, among other things, the Mexican Plan and the Lifting Order; (c) the Disclosure Statement[6] which I understand was sent by AHMSA to its U.S. creditors;[7] and (d) the Verified Petition and the other supporting pleadings and documents filed by the Foreign Representative with respect thereto.

4.      If called upon as a witness, I could testify competently from my own knowledge to the matters set forth hereinafter.

---

[4]     I have been advised by counsel to the Foreign Representative that the Verified Petition seeks an order (a) recognizing the SP Proceeding as a foreign main proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code"); (b) recognizing the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the SP Proceeding; (c) giving full force and effect in the United States to the order issued on May 16, 2016 by the Mexican Court (the "Lifting Order"), approving the Debtor's General Payment Agreement (the "Mexican Plan") and lifting the Debtor's suspension of payments, including any extensions or amendments thereof authorized by the Mexican Court; (d) as provided in the Lifting Order and the Mexican Plan, permanently preventing all persons from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtor or its property in the United States based on claims arising before the SP Proceeding; and (e) granting such other and further relief as this Court deems just and proper.

[5]     Pursuant to applicable Mexican law, the SP Proceeding continues under the SP Law notwithstanding the enactment of the Concursos.

[6]     The Disclosure Statement is attached as Exhibit G to the Foreign Representative Declaration.

[7]     It is my understanding that while not required by SP Law, the Debtor sent the Disclosure Statement to its U.S. Recognized Creditors and Noteholders to ensure that such creditors would receive adequate notice and information regarding the Conditional Agreement, the Mexican Plan and creditors' rights under applicable law, the Debtor's business, and the Creditors' Meeting.

## QUALIFICIATIONS

5.    I obtained my law degree in 1975 from Escuela Libre de Derecho, which is located in Mexico City.  I have been duly licensed to practice law by the Federal Government of Mexico for 40 years and hold professional license number 423996.  I am a partner at the law firm of BFG, where I have practiced as an attorney since I graduated from law school in 1975.  I have served as Managing Partner of BFG since 1987.  I specialize in civil and commercial litigation in courts in Mexico and have previously participated in proceedings in foreign courts as an advisor and expert witness.

6.    I have significant experience in Mexican insolvency proceedings, including under the SP Law and the Concursos.  I have participated in dozens of Mexican insolvency cases under the SP Law or the Concursos, as an attorney acting on behalf of debtors or creditors.  For over 27 years, I served as the head professor of bankruptcy law, general theory of process and general theory of obligations and successions at Universidad Panamericana, Escuela Libre de Derecho, Universidad del Nuevo Mundo, and Universidad Anahuac del Norte in Mexico City.  I am currently serving as President of the Fifth National Conference on Insolvency Law.  I have been a guest speaker at a number of significant conferences on insolvency law, including the Latin American Congress of Bankruptcy Law, the Second Latin American Congress of Bankruptcy Law, and the First, Second, and Fifth National Conferences on Insolvency Law held in Veracruz, Mexico.

7.    I have been retained by the Foreign Representative to provide a general overview and explain the relevant provisions of the SP Law, including how it applies to AHMSA's SP Proceeding.

# THE SP LAW

**A.      Overview of the SP Law & AHMSA's SP Proceeding—Generally**

8.      The SP Law is an insolvency law in Mexico which was enacted in 1943 and was replaced by the Concursos in 2000 (as described further below).  The intent of the SP Law is to prevent existing businesses from failing, which would force such businesses to declare bankruptcy and have their assets liquidated.  There is a significant social benefit to restructuring businesses, as these businesses provide jobs and produce goods and services.  For these reasons, the continued existence of these businesses is beneficial to the public.[8]  Additionally, creditors of insolvent companies tend to receive better recoveries from an operating business than from a liquidating business.  Accordingly, the SP Law was enacted to allow insolvent businesses the opportunity to restructure their debts, come to an agreement with creditors, and try to prevent the business from declaring bankruptcy and liquidating.  It is my understanding that a SP Proceeding under the SP Law is analogous to a reorganization case under chapter 11 of the Bankruptcy Code.

9.      A proceeding under the SP Law is a collective judicial proceeding which is comprehensive as to all of the debtor company's assets and creditors located both inside and outside of Mexico.  It is a general principle of the SP Law that an SP Proceeding is intended to be universal, not confined to just a debtor's assets and liabilities situated in Mexico.

10.      A proceeding under the SP Law is commenced by the filing of a petition by a debtor company or a person.  The petition is filed in the court in the jurisdiction where the debtor resides.  For example, AHMSA filed its petition on May 24, 1999 with the First Civil Court of First Instance for the Judicial District of Monclova because AHMSA's offices are located in Monclova.

---

[8]      For example, AHMSA is the largest employer in Monclova, is Mexico's largest steel producer and exporter, and its business provides over 19,000 jobs to the public.

B.    **Classification, Treatment, and Related Issues Pertaining to Creditors under SP Law and in AHMSA's SP Proceeding**

11.    The SP Law recognizes the equality of similar creditors.  Specifically, the SP Law requires that a creditors' agreement (such as the Mexican Plan) treat all similar creditors equally according to their classes.  As an initial matter, certain claims against the debtor's estate are paid with priority over any other claims.  These claims include: (a) expenses for safekeeping, preservation and administration of the property of the debtor's estate[9] and (b) claims arising from judicial or non-judicial proceedings for the common benefit, provided such proceedings were duly authorized.[10] Pursuant to Article 261 of the SP Law, claims against the debtor's estate are classified as follows, in descending order of priority: (a) creditors who are exclusively privileged;[11] (b) secured creditors;[12]

---

[9]    Examples include accrued expenses for the prevention of environmental hazards on the debtor's estate or costs related to the maintenance of debtor's property (such as buildings, factories, etc).

[10]    This includes, among other things,  any legal expenses for judicial or non-judicial proceedings related to maintenance of debtor's property.

[11]    "Exclusively privileged" creditors include (a) creditors having claims for burial expenses, (b) creditors having claims for medical expenses for an illness that caused the debtor of the debtor where bankruptcy was declared after death and (c) employees owed salaries for services rendered within 12 months prior to the suspension of payments declaration.

[12]    Secured creditors receive payments from the proceeds of their collateral in the order in which their security interests were recorded (at an ordinary rate and not at a moratory rate, but only if the secured creditor abstained in the voting on the plan at the creditors meeting).  Only the remaining equity, if any, in such collateral over and above the secured debt is then available for other creditors.

(c) creditors with special privilege;[13] (d) common creditors due to mercantile operations;[14] and (e) common creditors based on civil law.[15]

12.     In AHMSA's SP Proceeding, I understand that at this time there are no exclusively privileged or secured creditors (as all of AHMSA's debt is unsecured).  All of AHMSA's creditors are common unsecured creditors arising out of AHMSA's mercantile operations.  All of AHMSA's unsecured creditors were afforded the same opportunities throughout the SP Proceeding and under the Mexican Plan, as they all had the right to (a) receive notices regarding key developments in AHMSA's SP Proceeding (as further described below); (b) petition the Mexican Court for their claims to be "recognized" (as further described below); (c) participate in all aspects of the SP Proceeding, including objecting to proposed orders and appealing such orders (as further described below); and (d) share *pro rata* in the distributions of cash and equity required to be distributed by AHMSA under the Mexican Plan.

13.     Foreign creditors are also treated identically to Mexican creditors under the SP Law and are offered the same opportunities to participate in SP Proceedings as Mexican creditors.  In addition, all foreign debts are converted to Mexican pesos at the prevailing exchange rate of the foreign currency to pesos on the date that the case is officially declared to be an SP Proceeding.

14.     In AHMSA's SP Proceeding, consistent with the requirements of the SP Law, all of the Debtor's obligations which were denominated in a currency other than Mexican pesos were

---

[13]     "Specially privileged" creditors are creditors that in accordance with a statute have a special privilege (e.g., mechanic's liens).  Such specially privileged creditors are entitled to be paid first out of the proceeds of the sale of their collateral, but if several claims arise from the same good or asset, a *pro rata* distribution shall be made without distinction for when the respective specially privileged creditors gained interests in the collateral except if applicable law provides for the contrary.

[14]     Common creditors whose claims are based upon "mercantile operations" (arising out of normal business operations) collect *pro rata* without regard to the date on which their claims arose.

[15]     This class includes common creditors whose claims arose from civil law obligations, not arising out of the normal course of business (such as claims by professionals for services rendered, certain personal injury claimants, service providers, etc.).

deemed converted into Mexican pesos at the prevailing exchange rate on the SP Commencement

Date,[16] and all foreign creditors were given the same opportunities to participate in the SP Proceeding

as domestic creditors, including the right to (a) file appropriate petitions to be "recognized" as

creditors, (b) receive notice, participate and vote in creditors' meetings, (c) participate in the

"intervention," (d) appear in court and object to proposed orders; (e) appeal any court orders,[17]

(f) oppose the appointment of certain individuals as the Trustee and (g) request the conversion of the

AHMSA SP Proceeding to a bankruptcy (liquidation).  AHMSA's foreign creditors appointed

representatives to receive official notices in the SP Proceeding.  In addition, although not required by

the SP Law, I understand that AHMSA provided certain information regarding the principal events of

the SP Proceeding directly to its U.S. Recognized Creditors and Noteholders, including by

(a) preparing and sending the Disclosure Statement regarding the Conditional Agreement, the

Mexican Plan, the Debtor's business and operations, and notice of the Creditors' Meeting and

(b) launching a publicly available website, cases.primeclerk.com/AHMSA15, which contained the

Disclosure Statement and other information regarding the Debtor's restructuring.

　　　　15.　　The SP Law requires that (with certain exceptions as described further below)

all litigation regarding claims against the debtor company take place in the court which is presiding

over the SP Proceeding.  Litigation in other jurisdictions is not permitted, no attachment on the

debtor's assets can take place during the relevant SP Proceeding and no execution on the debtor's

assets can take place outside of the SP Proceeding.  Specifically, pursuant to Articles 126 and 408

through 410 of the SP Law, after the entry of the order commencing the SP Proceeding, (a) the debtor

---

[16]　　On the SP Commencement Date, I understand the prevailing exchange rate was 9.5468 pesos to $1.00 (USD).

[17]　　It is my understanding that certain creditors appealed AHMSA's declaration of suspension of payments under the SP Law (which appeals were subsequently dismissed by the relevant Mexican Court).

is not permitted to pay any prepetition claims and (b) all suits against the debtor that have as their purpose claiming compliance with a monetary obligation shall be suspended except for, as applicable to legal entities, labor proceedings and proceedings for the enforcement of a security interest *in rem* (e.g., mortgage, pledge, etc.). These restrictions against the payment of prepetition claims and the continuation of most suits against the debtor are intended to ensure that the SP Proceeding is organized in one appropriate venue (court) and that all creditors are treated equally, according to their classes. All of the requirements detailed in this paragraph were followed in AHMSA's SP Proceeding, in compliance with the applicable provisions of the SP Law.

16.    All creditors have a fair opportunity to present and prosecute their claims against the debtor. Specifically, creditors file a petition with the court to be "recognized" as creditors and for the amount of their asserted claims to be approved. The debtor then has an opportunity to respond to each creditor's petition for a claim, and the Trustee submits his opinion on the creditor's petition. All parties in interest can offer evidence on the proper amount of the claim and be heard by the court. After considering argument and evidence regarding a claim, the court will make a ruling on the creditor's claim, including the amount of the debt owed by the debtor to the creditor. In AHMSA's SP Proceeding, the Lifting Order includes the name of the creditors, appropriate classification, and the amount of the claim that has been recognized and approved by the Mexican Court.

**C.    Adequate Disclosure, Notice, & Objection Rights**

17.    The SP Law provides for notice of significant developments in an SP Proceeding to be (a) sent via certified mail to the creditors of the debtor according to the addresses in its books and records and (b) published in national newspapers. For example, when AHMSA's SP Proceeding was commenced, a notice was sent to all creditors giving them the right to authorize

representatives to receive court notices on their behalf and present their claims.  All of the Mexican

Court's orders in the SP Proceeding were published in the local Judicial Gazette (in Monclova,

Mexico).  Notices were sent to all creditors before every meeting of creditors, and notice of the

meeting for recognition of creditors and voting on the Plan was published in the Federal Official

Gazette, one national newspaper, and five other local newspapers during February 2-4, 2016, and

voluntarily in the *Wall Street Journal* (National Edition) in the United States on February 18, 2016.

18.    Creditors have the right to file objections to actions proposed to be taken by the

debtor company and/or the court, to seek revocation of a court's orders, and to file appeals from

decisions made by the court.  Creditors appear in court through representatives, who have access to all

court files at any time, and will be notified of all the court's orders that require personal notification of

creditors.  Creditors have the right to appeal all court orders, and even if the appeal is subsequently

denied, creditors may seek a separate federal review through an "Amparo" proceeding[18] if they

believe certain constitutional rights have been violated. As described further below, creditors also

have the right to name or be named as an "intervenor" to supervise (a) the administration of the SP

Proceeding, (b) the Trustee and its actions in the SP Proceeding, and (c) the administration of the

debtor's assets.  In AHMSA's SP Proceeding, over nine hundred creditors submitted claims against

AHMSA.  Many of these creditors extensively participated in the SP Proceeding by, among other

things, objecting to (a) certain of the Mexican Court's orders (and appealing such orders) and

(b) recognition of other creditors' claims or the amounts of such claims to be "recognized."  Certain

---

[18]    An "Amparo" proceeding is an extraordinary constitutional appeal, which may be filed in federal court, by
Mexicans and by foreigners. It is often referred to as a "constitutional protection lawsuit." An "Amparo"
proceeding may be used for several purposes: (a) as a defense of the individual guarantees provided in the
Constitution; (b) against unconstitutional laws; (c) to review the legality of judicial decisions; (d) against
final administrative decisions, awards, and resolutions affecting private parties; or (e) to protect communal
rights of an agrarian nature.

creditors also attempted to convert the SP Proceeding into liquidation (bankruptcy).  Attempts to convert AHMSA's SP Proceeding into liquidation were all denied by the applicable court.

        **D.**        **Role of Síndico (Trustee) & Intervenor in an SP Proceeding**

        19.      In proceedings under the SP Law, the debtor will continue to administer its assets and operate its business.  A *síndico* (the "Trustee"), which is considered an officer and fiduciary of the court, is appointed to assist the court in monitoring the activities of the debtor company.  The Trustee monitors the activity of the debtor and its compliance with the requirements with the SP Law, and is required to file a report with the court every three months regarding the debtor's activities and administration of its business, which report also includes the Trustee's valuation of the Debtor and its assets.  The Trustee will render an opinion as to the debtor's proposed plan, which is (in part) based on the Trustee's valuation of the debtor's assets and his opinion that the debtor will be able to comply with the requirements of the proposed plan.  In the event that a debtor's case is converted to a liquidation under the bankruptcy law, the Trustee takes over the administration of the business, sells the debtor's assets, and makes distributions to creditors in a priority order consistent with the SP Law. The Trustee essentially acts as an auxiliary of the court throughout the SP Proceeding, as he has the right to advise the court about what he considers proper with respect to the rights of all parties, and even to ask for the approved plan to be declared invalid if the Trustee discovers that there is a violation of the plan.

        20.      Typically, the Trustee is the applicable Mexican Chamber of Commerce to which the debtor company is a member, which then delegates its duties to an individual approved by the court.  In AHMSA's SP Proceeding, the National Chamber of Transformation Industry ("NCTI") was appointed to serve as the Trustee to monitor the Debtor's conduct and assist the Mexican Court, which, in turn, delegated its duties (as is permitted under the SP Law) to Francisco Javier Gaxiola

Fernández, who is now serving as the proposed Foreign Representative.  It is my understanding that the NCTI elected to delegate its duties to Mr. Gaxiola Fernández due to his vast prior experience as a delegate Trustee for other SP Proceedings.

21.     In selecting the Trustee, the court first asks the Chamber of Commerce if it will accept such role and name a delegate.  All creditors have the right to object and be heard on the appointment of the delegate selected by the Chamber of Commerce, which objections have to be resolved by the court before the delegate can be formally appointed.  The creditors and the debtor also have the right to appeal the court's decision appointing the delegate as Trustee.

22.     Additionally, the debtor's creditors in a SP Proceeding have the right to appoint one or more "intervenors" to oversee the debtor's operations and ensure that the Trustee is properly performing his duties.  The intervenor is an important part of the SP Proceeding because the intervenor represents the collective interests of all the debtor's creditors, acts as the "watchdog" to ensure the Trustee performs necessary responsibilities, and has a duty to oversee the SP Proceeding.  There can be one, three or five intervenors appointed.  A common representative, whose role is to take on a proactive role and represent the collective interests of all intervenors (and in turn, all of the debtor's creditors), is also typically selected from the appointed intervenors

23.     In AHMSA's SP Proceeding, Bank of America, N.A. was initially appointed by the creditors as one of the intervenors and the common representative of the intervention, but resigned in 2003.  Bank of America was replaced as the common representative of the intervention by Banamex, which resigned in 2007.  Following the resignation of Banamex as common representative of the intervention, the creditors did not name a substitute.  Additional intervenors, who did not serve as common representative, included Probursa and Banco Bilbao Vizcaya, and alternate intervenors were Caterpillar, Hewlett Packard and Ecoban.

**E.        Plan Approval Process & Lifting of Suspension of Payments**

24.        Under the SP Law, a "preventive agreement" (or a "Plan") determines the distributions to be made to a debtor's creditors.  A Plan must provide for one of the following treatments for creditors: (a) immediate payment of creditors in the amount of 40% of their claims (the "Immediate Payment Option"), (b) payment of creditors in the amount of 50% of their claims within two years of the lifting of the suspension of payments (the "Two Year Payment Option") or (c) full payment of all creditors within three years of the lifting of the suspension of payments (the "Three Year Payment Option").[19]  In each case, creditors' claims will not accrue any interest after the date of the filing of the applicable SP Proceeding.  The votes of a debtor's affiliates and insiders are not counted in determining whether the required voting thresholds have been satisfied.

25.        Further, a Plan must provide for the similar treatment of similarly situated creditors, include adequate assurance of the debtor's compliance therewith, and a timetable for repayment and the mechanisms for the debtor to carry out the terms of the Plan.

26.        If the creditors vote in favor of a Plan by the requisite amount, the Plan will be submitted to the judge overseeing the SP Proceeding.  Approval of the Plan will be granted if the following requirements are met: (a) the debtor was not ineligible to be declared in suspension of payments, (b) the amount offered under the Plan must be the best efforts of the debtor to pay its debts and (c) the debtor's performance of the Plan is sufficiently guaranteed when considering the value of the assets of the debtor.

27.        The ultimate goal of a SP Proceeding is to have a Plan agreed to by the debtor's creditors and approved by the court, thereby avoiding a liquidating bankruptcy.  The court's approval of a Plan "lifts" the debtor's suspension of payments, although the SP Proceeding will remain open

---

[19]        As described further below, the voting threshold to approve a Plan is different depending on which type of Plan the debtor proposes.

while the Trustee continues working until the debtor fully performs its obligations under the approved Plan.

28.     In order for a Plan to be approved, it must first be voted on by a debtor's creditors at a meeting of creditors which is scheduled by the court at the request of the debtor. However, under the SP Law, all claims must be resolved before certain meetings of creditors (and the voting on the Plan) can take place.  This claims resolution process can be very complex and time consuming, particularly when a debtor has many creditors, because there is likely to be litigation between the debtor and its creditors regarding the validity and amount of claims, and each claim must be fully resolved before certain meetings of creditors can take place, such as those meetings that require votes by both numerosity and amount of debt.  The debtor and creditors will also have the right to appeal any court orders regarding claims, which can also add significant time to the claims resolution process.

29.     Once all claims have been resolved, the debtor is permitted to publish its Plan, and a meeting of creditors is scheduled by the court.  At the meeting of creditors, all recognized creditors are entitled to vote on the Plan.  The voting threshold required to be met in order for the Plan to be approved is different depending on the type of plan being proposed by the debtor, who can elect the Immediate Payment Option, the Two Year Payment Option or the Three Year Payment Option.  In each case, there is a requirement of a quorum of 51% of all creditors (by numerosity).  In particular, under the Immediate Payment Option, one third of all creditors present at the meeting must vote in favor of the plan, and depending on the amount offered to be paid by the debtor, such creditors must represent a minimum of 50% of the debtor's outstanding debt.  With respect to the Two Year Payment Option, one third of all creditors present at the meeting must vote in favor of the plan, which creditors represent at least 50% to 75% of the debtor's outstanding debt (depending on the amount offered to be

paid by the debtor).  With respect to the Three Year Payment Option, one third of all creditors present at the meeting must vote in favor of the plan, which creditors represent at least 50% of all outstanding debt.

30.    Since AHMSA's plan proposed the Three Year Payment Option, it was required to have a quorum of at least 51% of all creditors present at the meeting, and at least one third of all creditors present at the meeting had to vote in favor of its Mexican Plan, which creditors represent at least 50% of all outstanding debt.  This voting requirement was met, as 435 recognized creditors representing approximately 61% of all of AHMSA's creditors voted in favor of the Mexican Plan, representing approximately 75.71% of all outstanding debt.[20]  All creditors present at the meeting voted in favor of the Mexican Plan.  Although certain of AHMSA's subsidiaries were recognized as creditors and had the right to vote on the Mexican Plan, the requisite creditor thresholds would have been achieved even without counting the votes of AHMSA's subsidiaries.

31.    If a debtor's proposed Plan is not approved, either by the requisite vote of creditors or because the court, in its discretion, finds that it should not be approved, the debtor is automatically forced into liquidation.[21]  Therefore, a debtor under the SP Law tends to act with caution in ensuring that it has the requisite creditor support for a Plan before formally proposing a Plan to the court, since failure to achieve the required support will automatically result in the debtor's liquidation.

32.    Once a Plan is approved by the requisite amount of creditors at the meeting of creditors, a hearing is held before the court on whether the Plan should be approved.  At the hearing, any creditor who voted against the Plan (or did not vote on the Plan) has the opportunity to present objections as to why the Plan should not be approved by the court.  After considering all objections,

---

[20]    These amounts exclude AHMSA's subsidiaries.

[21]    Additionally, the Trustee, a creditor, or the General Attorney can also petition a court to convert a debtor's case to a liquidating bankruptcy if the debtor is unable to operate its business or is committing a crime.

the court will enter an order either approving or denying approval of a Plan.  If the Plan is approved, the suspension of payments is "lifted" and the debtor exits from formal protection under the SP Law, although it must meet its obligations under the approved Plan (and the debtor can still be forced into liquidation if it fails to meet such obligations).

33.    In AHMSA's SP Proceeding, the Mexican Court approved the Plan on May 16, 2016 (the "AHMSA Plan Approval Hearing"), officially declared the SP Proceeding "lifted," and entered the Lifting Order.  The Mexican Court specifically found that AHMSA's Plan, including the Three Year Payment Option, fully complied with all requirements of SP Law.  Among other things, the Lifting Order discharged the Debtor's obligations to pay recognized claims (and provided for an injunction against creditors attempting to collect upon such discharged claims and also obligated the Debtor to make the Three Year Payment Option).  I have been advised by AHMSA and the Foreign Representative that no creditors made any objections to AHMSA's Plan at the AHMSA Plan Approval Hearing.

34.    After the Plan is approved by the court, notice regarding its approval is sent to the debtor's creditors and published in national newspapers for three consecutive business days. Following the conclusion of such publication, dissenting creditors have three days in order to file an appeal with respect to an approved Plan.  Additionally, there is a three month period wherein dissenting creditors or the Trustee can file a separate lawsuit collaterally attacking the Plan requesting that it be declared invalid or null on certain limited grounds, including that fraudulent transfers or fraudulent votes occurred, that creditors were not sufficiently represented by counsel, that proper publication of the meeting of creditors was not complied with or that any other technical requirement was not met by the debtor.  I am unaware of any plan under the SP Law ever being declared invalid or null.

35.    AHMSA sent a notice regarding its approval of the Plan to all creditors and also published the notice in the *Diario Oficial de la Federación* on July 6, 7, and 8 of 2016, and no appeals were filed with respect to the approved Plan during the subsequent three-day appeals time period.  On August 9, 2016, the Debtor commenced distribution of the Election Shares and Election Cash to those creditors who made a valid Equity Election.

### F.    The Replacement of the SP Law by the Concursos

36.    On May 17, 2000, the SP Law was officially replaced by the Concursos.  The primary reason for the adoption of the Concursos was Mexico's adoption of the UNCITRAL Model Law on Cross-Border Insolvency.  Following Mexico's adoption of the Concursos, insolvency cases which began under the SP Law were to be continued under the SP Law and were not converted to cases under the Concursos.   Therefore, since AHMSA's SP Proceeding began on May 25, 1999, before the official adoption of the Concursos, its SP Proceeding continues to be governed by the SP Law.  The reason why cases already commenced under the SP Law were continued under the SP Law (as opposed to the Concursos) is because retroactive application of a law is forbidden by the Federal Constitution.  Also, it would have been difficult and unfair for cases that had already made progress pursuant to the SP Law to be subject to a new set of rules and requirements under the Concursos.

### G.    Principal Distinctions between the SP Law and the Concursos

37.    One principal difference between the SP Law and the Concursos is that the Concursos requires that an agreement on a Plan be reached within one year of the filing of the case or the debtor company will be forced into liquidation.

38.    However, that requirement has caused the Concursos to attract criticism as essentially being a law of liquidation, as it forces many companies into liquidation which would otherwise be able to continue as a going concern simply because their creditors did not agree to a plan

within one year.  This is a significant difference between the Concursos and the SP Law, as the SP

Law does not have a deadline for when a Plan must be accepted by creditors before liquidation must

be ordered by the court.

39.    Another major difference between the Concursos and the SP Law is that the SP

Law has more limits on what a Plan could contain.  Specifically, the SP Law provides that recoveries

to creditors must be fully paid within three years of the lifting of the suspension of payments, and that

at least 40% of creditors' recognized claims must be paid.  The Concursos contains no such

requirements, which has led to cases wherein common unsecured creditors have received less than a

10% recovery.

40.    One final difference of note is that the Concursos permits creditors to file

lawsuits against the debtor company in courts other than the one in which the insolvency case is

pending, while the SP Law operates as a "stay" of all proceedings against the debtor while the

suspension of payments is in place.

**H.    The Length of AHMSA's SP Proceeding is Reasonable Given the Circumstances**

41.    AHMSA's SP Proceeding has been pending before the Mexican Court for

approximately seventeen years.  However, after reviewing the details of how litigious and complex the

SP Proceeding has been, it is not surprising to me that the SP Proceeding has continued for this

duration.[22] There are a number of different reasons which have combined to cause AHMSA's SP

Proceeding to take approximately seventeen years to be resolved.

42.    First, as discussed, in order for a meeting of creditors to vote on the plan to be

held, all claims must be fully and finally resolved.  AHMSA's claims resolution process was

---

[22]    Additionally, AHMSA's case is not the only case under the SP Law which has taken at least seventeen years to conclude – there are currently pending at least seven other complex cases under the SP Law which were commenced during 1995, before the adoption of the Concursos, which are still continuing.

extremely complex, as it had (a) over nine hundred creditors which petitioned to be recognized creditors, of which the Court ruled that 712 creditors were "recognized creditors," and (b) debt of approximately $1.7 billion (USD).  Resolving over nine hundred claims took an inordinate amount of time, particularly because many of AHMSA's creditors extensively fought the claims resolution process.  For example, certain creditors commenced proceedings seeking to convert the AHMSA SP Proceeding into a liquidating bankruptcy and also sought interest payments for after the date of filing of the SP Proceeding despite the fact that the SP Law is clear that no interest shall be paid once the SP Proceeding is officially commenced.  See Article 128(ii) of the SP Law.  Furthermore, there were numerous appeals that had to be resolved by the Superior Court, as well as appeals which were resolved in Amparo proceedings before Federal Judges and Federal Circuit Courts.  Additionally, some of these appeals sought the conversion of AHMSA's SP Proceeding into a bankruptcy (liquidation) proceeding (which requests were denied by the courts).  Specifically, the court files of AHMSA's SP Proceeding reflect that there were thousands of documents filed in connection with the resolution of claims.  Such litigation regarding the resolution of claims included a number of appeals, which ultimately resulted in approximately $40 million in claims not being recognized.  This process resulted in significant delay of AHMSA's SP Proceeding while all of the claims litigation was resolved.

43.     In addition, as discussed above, AHMSA needed to ensure that it had the support of the requisite number of creditors in order to vote in favor of its Mexican Plan, since failure to achieve the requisite voting threshold would require AHMSA's SP Proceeding to immediately be converted to a liquidation.  Therefore, AHMSA proceeded carefully in negotiations with creditors to garner the required support for the Mexican Plan.  Such negotiations took place over a long duration of time and included discussions with AHMSA's creditors.

44.    The Mexican Court also presided over the SP Proceedings of AHMSA's affiliates during this time period.  Specifically, three of AHMSA's subsidiaries also filed for protection under the SP Law on May 24, 1999, and their suspension of payments cases were also heard and resolved by the Mexican Court.  Stated otherwise, part of the reason for the seventeen year duration of AHMSA's SP Proceeding is that the Mexican Court was required to resolve the SP Proceedings of several of AHMSA's subsidiaries  (as all related entities are required under the SP Law to file for SP in the same Mexican Court for logistical purposes). Specifically, three of AHMSA's subsidiaries also had SP Proceedings: Minera Carbonifera Rio Escondido, S.A. de C.V., Minera del Norte, S.A. de C.V., Minerales Monclova, S.A. de C.V.  All of the SP Proceedings of AHMSA and its subsidiaries were administered under the same court file: 353/1999.  The Mexican Court chose to resolve the SP Proceedings of AHMSA's subsidiaries first, so AHMSA had to wait until the Mexican Court was ready to administer and resolve AHMSA's SP Proceeding.  AHMSA's subsidiaries are no longer in their SP Proceedings, as their payment plans were approved during 2006, 2008 and 2008, respectively.  That is, AHMSA's SP Proceeding is the last remaining SP Proceeding, as its subsidiaries have emerged from protection under the SP Law.

45.    Finally, the Mexican Court is a court of general jurisdiction and hears all matters in its geographic area, including not just insolvency proceedings pertaining to SP Law but also matters relating to criminal law, contract and property law, family law.  The Mexican Court's heavy docket and workload is another reason why AHMSA's SP Proceeding has taken so long, as the Mexican Court's availability and resources is limited given its nature as a court of general jurisdiction.  Indeed, at times, the workload for the Mexican Court on the SP Proceedings of AHMSA and its subsidiaries was so great that for a limited period of time no other lawsuits could proceed before the Mexican Court.

01:19115650.4

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of

the United States that the foregoing is true and correct to the best of my knowledge, information

and belief.

Dated: August _//_, 2016
    . Mexico City, Mexico

Respectfully submitted.

Jaime García Priani

_SP Law Expert to the Foreign Representative_